# GONZALEZ *v.* ROMAN CATHOLIC ARCHBISHOP OF MANILA.

No. 6.   Argued April 8, 9, 1929.—Decided October 14, 1929.

2

*Mr. Howard Thayer Kingsbury,* with whom *Messrs. Frederic R. Coudert* and *Allison D. Gibbs* were on the brief, for petitioner.

4

6

*Mr. William D. Guthrie;* with whom *Mr. George J. Gillespie* was on the brief, for respondent.

8

10

Mr. Justice Brandeis delivered the opinion of the Court.

This case is here on certiorari to the Supreme Court of the Philippine Islands. 278 U. S. 588. The subject matter is a collative chaplaincy in the Roman Catholic Archdiocese of Manila, which has been vacant since December 1910.[1] The main questions for decision are whether the petitioner is legally entitled to be appointed the chaplain and whether he shall recover the surplus income accrued during the vacancy.

Raul Rogerio Gonzalez, by his guardian *ad litem*, brought the suit against the Archbishop in the Court of

---

[1] A chaplaincy in the Roman Catholic Church is an institution founded by an individual for the purpose of celebrating or causing to be celebrated annually a certain number of masses conforming to the will of the founder. Chaplaincies are commonly divided into two classes—lay and ecclesiastical. A laical or mercenary chaplaincy is one instituted without the intervention of ecclesiastical authority; does not require a title in order to be ordained; and is not subject to ecclesiastical authority. The ecclesiastical or collative chaplaincy, although also founded by an individual, is one erected into a benefice by the proper spiritual authority; requires a title of ordination; and is thus subject to ecclesiastical control. When the foundation of an ecclesiastical or collative chaplaincy calls for relatives of the founder to enjoy the chaplaincy, it is called *colativa familiar*. When individuals of a certain family are not called to the possession but the patron is authorized to nominate, then the chaplaincy is called *colativa simple* or *gentilicia*. But whether the chaplaincy is *colativa familiar* or *colativa simple*, intervention of the proper spiritual authority to appoint and ordain is essential. Alcubilla, Diccionario de la Administracion Española, (5 Ed.) Vol. II, p. 259; The Catholic Encyclopedia, Vol. III, p. 580.

First Instance of Manila, on August 5, 1924. He prayed for judgment declaring the petitioner the lawful heir to the chaplaincy and its income; establishing the right of the petitioner and his successors to be appointed to and receive the income of the chaplaincy during their infancy whenever it may be vacant and, pending such appointment, to receive the income for their maintenance and support; declaring the trust character of the property and ordering it to be so recorded; directing the Archbishop to appoint the petitioner chaplain and to account to him for the income of the property from 1910 on; and directing the defendant to pay the petitioner 1,000 pesos a month pending the final determination of the case. The trial court directed the Archbishop to appoint the petitioner chaplain; and ordered payment to him of 173,725 pesos ($86,862.50), that sum being the aggregate net income of the chaplaincy during the vacancy, less the expense of having the prescribed masses celebrated in each year. It reserved to the petitioner any legal right he may have to proceed in the proper court for cancellation of the certificate of registration of the property in the name of the Archbishop. The Supreme Court of the Philippine Islands reversed the judgment on February 4, 1928, and absolved the Archbishop from the complaint, "without prejudice to the right of proper persons in interest to proceed for independent relief," in respect to the income accrued during the vacancy, or in respect to the reformation of the certificate of registration so as to show the fiduciary character of the title. As the amount in controversy exceeds $25,000, this Court has jurisdiction on certiorari, Act of February 13, 1925, c. 229, § 7, 43 Stat. 936, 940.

The chaplaincy was founded in 1820, under the will of Doña Petronila de Guzman. By it, she requested "the Father chaplain to celebrate sixty masses annually" in behalf of the souls of her parents, brothers, sisters and

herself. The deed of foundation, which was executed by the testamentary executor of Doña Petronila, provided that "said property is segregated from temporal properties and transferred to the spiritual properties of this Archbishopric, without its being possible to alienate or convert the property as such into any other estate for any cause, even though it be of a more pious character, . . . so that by virtue of this Deed of Foundation canonical collation may be conferred on the said appointed chaplain." By appropriate proceedings an ecclesiastical decree approved "the foundation of the chaplaincy with all the circumstances and conditions provided for in said clause (of the will) and in the deed of foundation, as well as the imposition (charge) of seventeen hundred pesos against said building, converting said sum into spiritual property of a perpetual character subject to the ecclesiastical forum and jurisdiction."

The will provided that the foundation should effect the immediate appointment as chaplain of D. Esteban de Guzman, the great-grandson of the testatrix; and "in his default, the nearest relative, and in default of the latter, a collegian (colegial) of San Juan de Letran, who should be an orphan *mestizo*, native of this said town." It named the president of that college as the patron of the chaplaincy. Esteban was appointed chaplain in 1820. From time to time thereafter four other descendants of the testatrix were successively appointed. The latest of these renounced the chaplaincy in December, 1910; married soon thereafter; and in 1912 became the father of the petitioner, Raul Rogerio Gonzalez, who is a legitimate son of the fifth chaplain and claims to be the nearest relative in descent from the first chaplain and the foundress.

Raul was presented to the Archbishop for appointment in 1922. The Archbishop refused to appoint him, on the ground that he did not then have "the qualifications required for chaplain of the said chaplaincy." He added:

"The grounds of my conclusion are the very canons of the new Code of Canon Law. Among others, I can mention canon 1442 which says: 'Simple chaplaincies or benefices are conferred upon clergymen of the secular clergy,' in connection with canon 108, paragraph 1, 'Clergymen are those already initiated in the first tonsure' and canon 976, paragraph 1, 'No one can be promoted to first tonsure before he has begun the course in theology.' In view of the Canon as above mentioned, and other reasons which may be adduced, I believe that the boy, Raul Gonzalez, is not legally (ecclesiastically speaking) capacitated to the enjoyment of a chaplaincy."

Ever since the Council of Trent (1545–1563), it has been the law of the church that no one can be appointed to a collative chaplaincy before his fourteenth year. When Raul was presented for appointment, he was in his tenth year. He was less than twelve when this suit was begun. He was fourteen when the trial court entered its judgment. It is also urged on behalf of the Archbishop that at no time since that Council could one be lawfully appointed who lacked elementary knowledge of Christian Doctrine.

The new Codex Juris Canonici, which was adopted in Rome in 1917 and was promulgated by the Church to become effective in 1918, provides that no one shall be appointed to a collative chaplaincy who is not a cleric, Can. 1442. It requires students for the priesthood to attend a seminary; and prescribes their studies, Can. 1354, 1364. It provides that in order to be a cleric one must have had "prima tonsura," Can. 108, par. 1; that in order to have "prima tonsura" one must have begun the study of theology, Can. 976, par. 1; and that in order to study theology one must be a "bachiller," that is, must have obtained the first degree in the sciences and liberal arts, Can. 1365. It also provides that no one may validly receive ordination unless in the opinion of the ordinary he

14

has the necessary qualifications, Can. 968, par. 1, 1464. Petitioner concedes that the chaplaincy here involved is a collative one; and that Raul lacked, at the time of his presentment and of the commencement of the suit, the age qualification required by the Canon Law in force when the chaplaincy was founded.[2] It is also conceded that he lacked, then, and at the time of the entry of the judgment, other qualifications of a candidate for a collative chaplaincy essential, if the new Codex was applicable.

Raul's contention, in effect, is that the nearest male relative in descent from the foundress and the first chaplain, willing to be appointed chaplain, is entitled to enjoy the revenues of the foundation, subject only to the duty of saying himself the sixty masses in each year, if he is qualified so to do, or of causing them to be said by a qualified priest and paying the customary charge therefor out of the income. He claims that the provisions of the new Codex are not applicable and that his rights are to be determined by the Canon Law in force at the time the chaplaincy was founded; and that the judgment of the trial court should be reinstated, because he possessed at the time of the entry of the judgment all the qualifications required by the Canon Law in force in 1820. Raul argues that contemporaneous construction and long usage have removed any doubt as to what these qualifications were; that when the foundation was established, and for a long time thereafter, the ecclesiastical character of the incumbent was a minor consideration; that this is shown by the administration of this chaplaincy; and that his own ecclesiastical qualifications, at the time of the entry of the

[2] In order to overcome this obstacle, petitioner filed an amended complaint in the trial court, without objection, when he was in his fourteenth year. The Supreme Court assumed "for the purposes of this decision that the immaturity of the plaintiff in point of age is not a fatal obstacle to the maintenance of the action."

judgment in the trial court, were not inferior to those of the prior incumbents. He asserts that, although chaplaincies were disamortized in Spain prior to 1867, Alcubilla, Diccionario, Vol. II, p. 118, they had in the Philippines remained undisturbed by any legislation of Spain; and that the rights of the church were preserved by Article VIII of the Treaty of Paris. 30 Stat. 1754, 1758. *Ponce* v. *Roman Catholic Church*, 210 U. S. 296, 315–322. He contends that to deprive him of his alleged right to the chaplaincy because of a change made in 1918 in the Canon Law would violate the Constitution of the United States, the Treaty with Spain of 1898, and the Organic Act of the Philippine Islands.

The trial court rested its judgment for Raul largely on the ground that he possessed, at the time of its entry, the qualifications required by the Canon Law in force when the chaplaincy was founded; and that, hence, he was entitled both to be appointed chaplain and to recover the income accrued during the vacancy, even though he did not possess the qualifications prescribed by the new Codex then otherwise in force. The Supreme Court held that to give effect to the provisions of the new Codex would not impair the obligation of the contract made in 1820, as it was an implied term of the deed of foundation that the qualifications of a chaplain should be such as the church authorities might prescribe from time to time; and that, since Raul confessedly did not possess the qualifications prescribed by the new Codex which had been promulgated before he was presented, he could not be appointed.

*First.* The Archbishop interposes here, as he did below, an objection to the jurisdiction of the Philippine courts. He insists that, since the chaplaincy is confessedly a collative one, its property became spiritual property of a perpetual character subject to the jurisdiction of the ec-

clesiastical forum; and that thereby every controversy concerning either the right to appointment or the right to the income was removed from the jurisdiction of secular courts. The objection is not sound. The courts have jurisdiction of the parties. For the Archbishop is a juristic person amenable to the Philippine courts for the enforcement of any legal right; and the petitioner asserts such a right. There is jurisdiction of the subject matter. For the petitioner's claim is, in substance, that he is entitled to the relief sought as the beneficiary of a trust.

The fact that the property of the chaplaincy was transferred to the spiritual properties of the Archbishopric affects not the jurisdiction of the court, but the terms of the trust. *Watson* v. *Jones,* 13 Wall. 679, 714, 729. The Archbishop's claim in this respect is that by an implied term of the gift, the property, which was to be held by the church, should be administered in such manner and by such persons as may be prescribed by the church from time to time. Among the church's laws which are thus claimed to be applicable are those creating tribunals for the determination of ecclesiastical controversies. Because the appointment is a canonical act, it is the function of the church authorities to determine what the essential qualifications of a chaplain are and whether the candidate possesses them. In the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise.[3] Under like circumstances, effect is given in the courts to the determinations

[3] *Watson* v. *Jones,* 13 Wall. 679, 727, 733; *Shepard* v. *Barkley,* 247 U. S. 1; s. c. *Barkley* v. *Hayes,* 208 Fed. 319, 327, aff'd *sub. nom. Duvall* v. *Synod of Kansas,* 222 Fed. 669; *Brundage* v. *Deardorf,* 92 Fed. 214, 228; *Connitt* v. *Reformed Protestant Dutch Church,* 54 N. Y. 551, 562.

of the judicatory bodies established by clubs and civil associations.[4]

*Second.* The Archbishop contended that Raul lacked even the minimum of training and knowledge of Christian Doctrine made indispensable by the Canon Law in force in 1820; that his confessed lack of the essential age at the time of the presentment and also at the time of the institution of the suit were unsurmountable obstacles to the granting of the prayer for appointment to the chaplaincy; and, moreover, that the failure to take an appeal to the Pope from the decision of the Archbishop, as provided by the Canon Law, precluded resort to legal proceedings. We have no occasion to consider the soundness of these contentions. For we are of opinion that the Canon Law in force at the time of the presentation governs, and the lack of the qualification prescribed by it is admitted. Neither the foundress, nor the church authorities, can have intended that the perpetual chaplaincy created in 1820 should, in respect to the qualifications of an incumbent, be forever administered according to the canons of the church which happened to be in force at that date. The parties to the foundation clearly contemplated that the Archbishop would, before ordination, exercise his judgment as to the fitness of the applicant; and they must have contemplated that, in the course of the centuries, the standard of fitness would be modified.

When the new Codex was promulgated in 1918 Raul was only six years old and had not yet been presented. If he had been presented, he obviously could not have been appointed. No right was then being enjoyed by him

---

[4] *Commonwealth* v. *Union League,* 135 Pa. 301, 327; *Engel* v. *Walsh,* 258 Ill. 98, 103; *Richards* v. *Morison,* 229 Mass. 458, 461; *People ex rel. Johnson* v. *New York Produce Exchange,* 149 N. Y. 401, 409–10, 413–14; *Van Poucke* v. *Netherland St. Vincent De Paul Society,* 63 Mich. 378.

of which the promulgation of the new Codex deprived him. When he was presented later, he was ineligible under the then existing Canon Law. In concluding that Raul lacked the qualifications essential for a chaplain the Archbishop appears to have followed the controlling Canon Law. There is not even a suggestion that he exercised his authority arbitrarily.

*Third.* Raul urges that, even though he is not entitled to be appointed chaplain, he is entitled to recover the surplus net income earned during the vacancy. Indeed, it is the property rights involved that appear to be his main consideration. The value of the property in 1820 was about 1,700 pesos. The annual net income was then 180 pesos, a sum sufficient only to defray the annual expense of sixty masses. The annual net income has grown to about 12,000 pesos; and the annual expense of the sixty masses does not now exceed 300 pesos. In each year during the vacancy the masses have been duly celebrated. The surplus income accruing during the vacancy has been used by the Archbishop currently for pious purposes, namely, education. By canon 1481 of the new Codex the surplus income of a chaplaincy, after deducting expenses of the acting chaplain, must one-half be added to the endowment or capital and one-half to the repair of the church, unless there is a custom of using the whole for some common good to the diocese. The use made of the surplus of this chaplaincy was in accordance with what was claimed to be the long established custom of the Archdiocese. Both the custom and the specific application made of this surplus have been approved by the Holy See. The Supreme Court held that since Raul had sought the income only as an incident of the chaplaincy, he could not recover anything.

Raul's claim, which is made even in respect to income accrued prior to his birth, is rested upon some alleged right by inheritance, although his father is still living.

The intention of the foundress, so far as expressed, was that the income should be applied to the celebration of masses and to the living of the chaplain, who should preferably be the nearest male relative in the line of descent from herself or the first chaplain. The claim that Raul individually is entitled as nearest relative to the surplus by inheritance is unsupported by anything in the deed of gift or the applicable law. Since Raul is not entitled to be appointed chaplain, he is not entitled to a living from the income of the chaplaincy.

Raul urges also an alleged right as representative of the heirs of the testatrix as a class. This suggestion was, we think, properly met by the ruling of the Supreme Court that the suit was not brought as a class suit. Whether the surplus income earned during the vacancy has been properly disposed of by the Archbishop and what disposition shall be made of it in the future we have no occasion to enquire. The entry of the judgment without prejudice " to the right of proper persons in interest to proceed for independent relief " leaves any existing right of that nature unaffected.

*Affirmed.*