Ralph L. MINKER, Appellant,

v.

BALTIMORE ANNUAL CONFERENCE OF UNITED METHODIST CHURCH and Bishop Joseph A. Yeakel, Appellees.

No. 89-7009.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 30, 1989.

Decided Jan. 19, 1990.

David S. Eggert, with whom Randal M. Shaheen, Washington, D.C. was on the brief, for appellant.

Thomas R. Kline, with whom Thomas E. Starnes, Washington, D.C. was on the brief, for appellees.

Before MIKVA and BUCKLEY, Circuit Judges, and GESELL,* District Judge.

Opinion for the Court filed by Circuit Judge MIKVA.

Concurring Opinion filed by District Judge GESELL.

MIKVA, Circuit Judge:

Appellant, a Methodist minister, challenges a lower court order dismissing his complaint for age discrimination and breach of contract against the United Methodist Church. Appellant charges that he was denied a pastorship due to age discrimination, and that this violated federal and state law as well as his "contract" with the church. The district court determined that the first amendment prohibits the government from regulating internal church decisions about the promotion of pastors, because churches have broad discretion in determining who may speak for the church. 699 F.Supp. 954 (D.D.C.1988). We affirm the district court's ruling to the extent that it dismissed appellant's age discrimination claims. We remand for further proceedings on the contractual claim that appellees breached their promise to give appellant a more suitable congregation at the earliest possible time.

## BACKGROUND

Appellant, Ralph Minker, is a 63-year-old Methodist minister employed by the Baltimore Annual Conference of the United Methodist Church. After serving for ten years as a vocational counselor, Minker requested that he be returned to a pastoral appointment in 1982. The following year, he assumed the pastorate of Mount Rainier Methodist Church on a temporary, emergency basis. Complaint ¶ 8–9.

Minker alleges that the Mount Rainier assignment paid him less than what a pastor of his qualifications and experience would normally receive. Id. Minker complained to the district superintendent who, he claims, assured him that he would be "moved to a congregation more suited to his training and skills, and more appropriate in level of income, at the earliest appropriate time." Id. at ¶ 13. Minker made repeated requests for reassignment thereafter, but as of June 1987 four years had elapsed without Minker being offered a new assignment. Id. at ¶ 14.

In July 1987, Minker filed suit in district court alleging that he had been denied a rightful "promotion" solely on the basis of his age. Minker asserted that appellee Bishop Joseph Yeakel—who is responsible for all pastoral appointments—had informed him that "he should not expect a new better level appointment and that Methodist pastors in their fifties cannot expect growth opportunities in new appointments." Id. at ¶ 16. Minker further claimed that persons younger than he were selected for many open appointments. Id.

The complaint alleged that appellees violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, 623 (1983), the Maryland Human Relations Law, Md.Ann.Code Art. 49B, § 16, and Minker's "contract" with his church. Complaint at ¶ 25. The contract claim was based both on the district superintendent's oral promises to find him a more suitable congregation, and on passages from the Book of Discipline—"the book of law of the United Methodist Church"—concerning the assignment of pastorships. Section 529.1 of the Book of Discipline states that "ap-

---

* Of the United States District Court for the District of Columbia, sitting by designation pursu-

ant to 28 U.S.C. § 292(a).

pointments are to be made without regard to race, ethnic origin, sex, color, or age, except for the provisions of mandatory retirement."

Initially, Minker sought monetary damages and an injunction against age discrimination under the ADEA. He has since been appointed pastor of the Corkran Memorial Church, and now desires only damages and a general injunction against future discrimination.

Appellees moved to dismiss, claiming that the first amendment barred appellant's suit. The district court granted the appellees' motion. 699 F.Supp. 954. The court held that applying state and federal antidiscrimination legislation or common law principles of contract to Minker's claims would violate the free exercise clause of the first amendment because it would interfere with church decisions concerning "whose voice speaks for the church." *Id.* at 955. The district court concluded that appellant's suit failed to state a claim upon which relief could be granted.

Minker appeals on two grounds. First, he contends that the first amendment does not apply to his statutory claims. He argues that the Church has no religious policy permitting age discrimination, and no religious belief can be implicated by the facts alleged. Second, he argues that the first amendment cannot bar enforcement of his private employment contract because the issue of breach does not implicate first amendment principles. Alternatively, he contends that even if the facts might implicate religious beliefs, the district court's decision to dismiss was premature since he should be afforded an opportunity to show that his contract claim does not create an excessive entanglement with church religious policy.

## I

### AGE DISCRIMINATION CLAIMS

■ Minker argues that application of the ADEA or the Maryland age discrimination provision would not violate either the free exercise clause or the establishment clause of the first amendment. Because we find that maintenance of appellant's suit would violate the free exercise clause, we need not consider whether it would also violate the establishment clause.

The first amendment provides that Congress may not interfere with the free exercise of religion. The free exercise clause bars enforcement of a statute whose application would directly affect religious beliefs. *Tilton v. Richardson,* 403 U.S. 672, 689, 91 S.Ct. 2091, 2101, 29 L.Ed.2d 790 (1970); *see also Wisconsin v. Yoder,* 406 U.S. 205, 216, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1971) (refusing effect to a mandatory school attendance law as applied to Amish children). Appellant argues that since the Church has already declared its opposition to age discrimination in employment decisions in the Book of Discipline, it cannot now claim that it has a religious belief supporting age discrimination. If no religious beliefs are involved, he reasons, no first amendment rights are implicated.

Appellant seeks to apply a "plain meaning" rule to interpreting the antidiscrimination provisions of the Book of Discipline ("Discipline"). We doubt that such a canon of construction is suitable to canon law. There is substantial ambiguity about the Church's position on age discrimination at the time this case arose. The 1984–88 version of the Book of Discipline provided that appointments must take into account the "unique needs of a charge ... and also the gifts and graces of a particular pastor." Discipline at ¶ 531. These gifts and graces include the pastor's "experience and continuing education, professional experience, records of performance, [and] *age.*" *Id.* at ¶ 531.2 (emphasis added). This suggests that, the nondiscrimination provision notwithstanding, the Methodist Church does have an asserted ecclesiastical interest in considering age in appointing pastors.

We need not consider the precise contours of church policy, however, to reject Minker's claim that lay courts have jurisdiction to hear his age discrimination claims. Rather, as the district court held, determination of "whose voice speaks for the church" is *per se* a religious matter.

699 F.Supp. at 955. We cannot imagine an area of inquiry less suited to a temporal court for decision; evaluation of the "gifts and graces" of a minister must be left to ecclesiastical institutions. This is the view of every court that has been confronted by this genre of dispute. *See, e.g., Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164 (4th Cir.1985), *cert. denied*, 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986).

In *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir.), *cert. denied*, 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972), the Fifth Circuit ruled that the free exercise clause precluded the application of Title VII to a minister's claim that her church had discriminated against her on the basis of her gender. The court reasoned that since the minister is the "lifeblood" of the church, the assignment of a minister is inherently of prime ecclesiastical concern. It observed that applying Title VII to assignment decisions would involve the court in substantive ecclesiastical matters and permit courts to interfere with church administration. Merely maintaining such a suit would produce "an investigation and review of ... matters of church administration and government ... [which] could only produce by its coercive effect the very opposite of that ... contemplated by the First Amendment." 460 F.2d at 558–60.

The plaintiff's claim in *Simpson v. Wells Lamont Corporation*, 494 F.2d 490 (5th Cir.1974), was almost identical to that raised here. The Fifth Circuit dismissed a Methodist pastor's suit, arising from his claim that he had been expelled from his parish because of his wife's race. The plaintiff argued that consideration of his suit did not involve religious matters, because he was dismissed for reasons unrelated to religious belief or policy. He too raised the antidiscrimination provision of the Book of Discipline, and the court expressly rejected this argument. It noted that there is no exception to the bar against interfering with matters of church administration. 494 F.2d at 493; *see also Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164 (4th Cir.1985), *cert. denied*, 478 U.S. 1020, 106

S.Ct. 3333, 92 L.Ed.2d 739 (1986); *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952).

As this court observed in *King's Garden Inc. v. FCC*, 498 F.2d 51, 56 (D.C.Cir.1974), "[t]he Free Exercise Clause precludes governmental interference with ecclesiastical hierarchies, church administration, and appointment of clergy." Not only may a church adopt its own idiosyncratic reasons for appointing pastors, but also it "has a legitimate claim to autonomy in the elaboration and pursuit of that goal." *Rayburn*, 772 F.2d at 1171. We need not find that the factors relied upon by the Church were independently ecclesiastical in nature, only that they were related to a pastoral appointment determination. *See Granfield v. Catholic University of America*, 530 F.2d 1035, 1047 (D.C.Cir.1976) (holding that the salary scale of priests in a church-related institution is an internal religious question).

Minker argues that taken to its logical conclusion our view would create a first amendment prohibition against even the most egregious human rights violations. He suggests, for example, that under our formulation courts would be prevented from enforcing homicide statutes against churches that selected their pastors by making them play russian roulette.

This hypothetical obviously distorts existing first amendment doctrine. The Supreme Court has consistently recognized that the religion clauses are subject to a balancing of interests test. *E.g., McDaniel v. Paty*, 435 U.S. 618, 628 n. 8, 98 S.Ct. 1322, 1328 n. 8, 55 L.Ed.2d 593 (1978). The Court has also concluded that certain civil rights protected in secular settings are not sufficiently compelling to overcome certain religious interests. *Gonzalez v. Roman Catholic Archbishop*, 280 U.S. 1, 16, 50 S.Ct. 5, 7, 74 L.Ed. 131 (1929) ("[Decisions of church authorities concerning] the essential qualifications of [clergy] and who possess them ... although affecting civil rights, are accepted in litigation before the secular courts as conclusive....").

**1358**

The cases cited by appellant in which courts have applied employment statutes to employees of church affiliated institutions are inapposite. In *EEOC v. Pacific Press Publishing Ass'n.*, 482 F.Supp. 1291 (N.D. Cal.1979), a secretary in a church-owned publishing house was permitted to maintain a sex discrimination action against her employer under Title VII. However, in that case, as in every other case cited by appellant, the court based its finding on the fact that these employees were not "ministers." The same "voice of the church" concerns simply were not present. *See, e.g., EEOC v. Mississippi College*, 626 F.2d 477, 485 (5th Cir.1980) (distinguishing *McClure* because "faculty members are not intermediaries between a church and its congregation").

Finally, appellant urges that the "minister/nonminister" distinction is unworkable. Appellant notes that under this distinction church secretaries and teachers are protected (*EEOC v. Mississippi College*, 626 F.2d 477 (5th Cir.1980), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981); *EEOC v. Pacific Press Publishing Ass'n.*, 676 F.2d 1272 (9th Cir.1982)) but seminarians or theology professors at a sectarian university are not (*EEOC v. Southwestern Baptist Theological Seminary*, 651 F.2d 277 (5th Cir.1981), *cert. denied*, 456 U.S. 905, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982); *Maguire v. Marquette University*, 627 F.Supp. 1499 (E.D.Wisc. 1986) *aff'd on other grounds*, 814 F.2d 1213 (7th Cir.1987)). These cases, he argues, illustrate that the ministerial functions test in fact encourages intrusive inquiries into church policy by raising questions about the role of individual employees. We doubt the merits of this argument, but in any event it is not appropriate to this case. Appellant is clearly a minister and so we find this case does not present an appropriate occasion to contemplate the merits of the "ministerial functions" test.

We affirm the district court's finding that application of ADEA or the Maryland statute to this case would violate the free exercise clause of the first amendment.

## II
### CONTRACT CLAIMS

The two contract claims of appellant raise different policy concerns. Appellant first contends that the Book of Discipline creates an enforceable agreement that the Church will not discriminate against him on the basis of age in making appointments. Second, he urges that the superintendent's promise to provide him with a more suitable pastorship at the earliest possible time constitutes an enforceable employment contract.

### A. *The Book of Discipline*

Section 529.1 of the Book of Discipline states that "appointments are to be made without regard to race, ethnic origin, sex, color, or age, except for the provisions of mandatory retirement." Appellant urges that this provision forms a contract between himself and the Church which he may enforce in a secular court. We have already pointed to the perils of appellant's efforts to give this provision only its literal contours. Even assuming that this provision does have some contractual aspects, this court could not interpret or enforce such a provision without running afoul of the first amendment.

As the Supreme Court noted in *Jones v. Wolf*, 443 U.S. 595, 602, 99 S.Ct. 3020, 3024, 61 L.Ed.2d 775 (1979), "the [First] Amendment requires that civil courts defer to the resolution of issues of religious doctrine or policy by the highest court of a hierarchical church organization." For this court to interpret the antidiscrimination provision of the Book of Discipline would require us to interpret or enforce matters of essential religious dogma.

It is true that not *all* provisions of a religious constitution are immune from civil court interpretation. In *Jones v. Wolf*, the Court adopted the neutral principles test which permits a court to interpret provisions of religious documents involving property rights and other nondoctrinal matters as long as the analysis can be done in purely secular terms. In doing so, the Court cited with approval a state court's

application of the Book of Discipline to a property dispute between a church and its congregation. 443 U.S. at 600–01, 99 S.Ct. at 3023–24 (citing *Carnes v. Smith*, 236 Ga. 30, 222 S.E.2d 322, *cert. denied*, 429 U.S. 868, 97 S.Ct. 180, 50 L.Ed.2d 148 (1976)).

The *Jones* court itself cautioned that not all provisions of a church constitution are susceptible to neutral interpretation. It observed that even among property provisions "there may be cases where the ... constitution of a general church incorporates religious concepts.... If in such a case the interpretation of the instruments of ownership would require the civil courts to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." *Id.* at 604, 99 S.Ct. at 3026; *see also Dowd v. Society of St. Columbans*, 861 F.2d 761, 764 (1st Cir.1988); *Hutchison v. Thomas*, 789 F.2d 392, 393 (6th Cir.), *cert. denied*, 479 U.S. 885, 107 S.Ct. 277, 93 L.Ed.2d 253 (1986) (dismissing a Methodist minister's claim that the church had violated his "contract" by improperly applying provisions of the Book of Discipline in discharging him because these involved "subjective judgments made by religious officials and bodies").

■ The age discrimination passages of the Book of Discipline are just such a provision. In determining whether the Church has discriminated on the basis of age, a court would be required to consider the religious purpose of the antidiscrimination provision and to define its limits for the Church. The scope of the Church's purported duty to not discriminate in its ministerial appointments will inevitably require interpretation of provisions in the Discipline that are highly subjective, spiritual, and ecclesiastical in nature. These duties are not necessarily identical to the government's duty under Title VII, but may be informed by such religious considerations as an evaluation of the "gifts and graces" of a minister. Unlike the property provisions at issue in *Jones*, Minker's suit necessarily involves interpretation of the minister's occupational qualifications which requires an "understanding of the genuine

desire to embody and carry forth more effectively Christ's ministry." Discipline at ¶ 445.

We hold that the interpretation of the appointment and antidiscrimination provisions of the Book of Discipline is inherently an ecclesiastical matter; it follows that this court lacks jurisdiction to hear Minker's contract claim.

### B. *Oral Contract*

■ Lastly, appellant argues that the first amendment cannot bar his action for breach of an oral employment contract. We find this contention compelling. The case arises on dismissal for failure to state a claim; therefore we must assume as true all allegations in Pastor Minker's complaint. *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969). We assume that the district superintendent did in fact promise to provide appellant with a congregation more suited to his training and skills in exchange for his continued work at the Mount Ranier Church. Such facts clearly would create a contractual relationship.

■ A church is always free to burden its activities voluntarily through contracts, and such contracts are fully enforceable in civil court. *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 714, 20 L.Ed. 666 (1871). In *Jones v. Wolf*, *supra*, the Supreme Court specified that courts may always resolve contracts governing "the manner in which churches own property, hire employees, or purchase goods." *Id.* at 606, 99 S.Ct. at 3027. Even cases that rejected ministers' discrimination claims have noted that churches nonetheless "may be held liable upon their valid contracts." *Rayburn, supra*, 772 F.2d at 1171.

The Church seeks to distinguish these precedents on the ground that even proving the existence of a contract in this case would require the sort of inquiry into subjective, spiritual, and ecclesiastical matters that the first amendment prohibits. The Church asserts that *Jones* is inapposite because it involved concrete matters that did not require a far-reaching inquiry. It is true, as the Supreme Court noted in anoth-

er context, courts may not consider provisions whose enforcement would require "a searching and therefore impermissible inquiry" into church doctrine. *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 723, 96 S.Ct. 2372, 2387, 49 L.Ed.2d 151 (1976).

The Church asserts that this case would produce the types of court inquiries into administrative matters prohibited in *Rayburn*. The *Rayburn* court held that entanglements might result from a protracted legal procedure which might involve subpoenas, discovery, and other tools designed to probe the mind of the church. 772 F.2d at 1170–71. The Church asserts that simply permitting a court to hear Minker's contract claims might distort church appointment decisions—causing churches to make only those choices that avoid the appearance of legal impropriety.

We acknowledge that the contract alleged by Minker threatens to touch the core of the rights protected by the free exercise clause. *See McClure v. Salvation Army*, 460 F.2d 553, 558–59 (5th Cir.1972) ("The relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose."). We also agree that any inquiry into the Church's reasons for asserting that Minker was not suited for a particular pastorship would constitute an excessive entanglement in its affairs. *See Natal v. Christian and Missionary Alliance*, 878 F.2d 1575 (1st Cir.1989) (inquiry into reasons for minister's discharge would plunge court "into a maelstrom of Church policy, administration, and governance"); *Rayburn*, 772 F.2d at 1171.

Nevertheless, the first amendment does not immunize the church from all temporal claims made against it. As we noted in *Costello Publishing Co. v. Rotelle*, 670 F.2d 1035 (D.C.Cir.1981), appellant need show only that *some* form of inquiry is permissible and *some* form of remedy is available to survive a motion to dismiss. In *Costello*, this court reversed a lower court grant of summary judgment for the Roman Catholic Church in an antitrust case concerning the church's alleged efforts to discourage retailers from purchasing a specific religious book. The court noted that summary judgment was inappropriate because the trial court should at least consider the circumstances of the alleged activity to determine whether a religious concern existed and whether a nonintrusive remedy could be fashioned. *Id.* at 1050 n. 31.

We find that appellant should be allowed to demonstrate that he can prove his case without resorting to impermissible avenues of discovery or remedies. As a theoretical matter, the issue of breach of contract can be adduced by a fairly direct inquiry into whether appellant's superintendent promised him a more suitable congregation, whether appellant gave consideration in exchange for that promise, and whether such congregations became available but were not offered to Pastor Minker. Similarly, Minker's injury can be remedied without court oversight. Money damages alone would suffice since Minker already has a new pastorship. Maintaining a suit, by itself, will not necessarily create an excessive entanglement. Furthermore, as the remedy would be limited to the award of money damages, we see no potential for distortion of church appointment decisions from requiring that the Church not make empty, misleading promises to its clergy.

It could turn out that in attempting to prove his case, appellant will be forced to inquire into matters of ecclesiastical policy even as to his contract claim. Of course, in that situation, a court may grant summary judgment on the ground that appellant has not proved his case and pursuing the matter further would create an excessive entanglement with religion. On the other hand, it may turn out that the potentially mischievous aspects of Minker's claim are not contested by the Church or are subject to entirely neutral methods of proof. The speculative nature of our discussion here demonstrates why it is premature to foreclose appellant's contract claim. Once evidence is offered, the district court will be in a position to control the case so as to protect against any impermissible entanglements. Thus, while the first amendment forecloses any inquiry into the Church's

assessment of Minker's suitability for a pastorship, even for the purpose of showing it to be pretextual, it does not prevent the district court from determining whether the contract alleged by Minker in fact exists. *Catholic High School Ass'n v. Culvert,* 753 F.2d 1161, 1168 (2d Cir.1985) (first amendment prohibition of state board's ability to inquire into nature of religious motives does not preclude it from asserting jurisdiction). For this reason, we find that appellant's oral contract claim cannot be totally foreclosed on a motion to dismiss.

## III

### FEDERAL JURISDICTION

Our holding raises a new jurisdictional issue on remand. Initially, federal jurisdiction over appellant's state law claims was proper under the district court's pendent federal question jurisdiction, 28 U.S.C. § 1331, or jurisdiction under federal civil rights statutes, 28 U.S.C. § 1343. Having properly dismissed appellant's federal age discrimination claims before trial, the district court may no longer assert pendent jurisdiction over appellant's state contract claims. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Sanchez–Espinoza v. Reagan,* 770 F.2d 202, 210 (D.C.Cir.1985).

If jurisdiction exists at all, it must lie on the basis of diversity of citizenship, 28 U.S.C. § 1332. Appellant alleges that he was "residing in Virginia" at the time he filed his complaint and that appellee is incorporated in the State of Maryland. We note that the complaint does not specifically allege that Minker is a "citizen" of Virginia, and to that extent, the claim of diversity jurisdiction is technically defective. *Whitelock v. Leatherman,* 460 F.2d 507, 514 n. 14 (10th Cir.1972). On remand, the district court must determine for itself whether diversity of citizenship exists before addressing the substantive contract claims presented. *National Farmers Union Property & Gas Co. v. Fisher,* 284 F.2d 421, 423 (8th Cir.1960). If the district court finds federal jurisdiction lacking, it may either dismiss or exercise its authority under 28 U.S.C. § 1631 to transfer this case to a court in which suit might more properly have been brought.

### CONCLUSION

The decision to appoint a minister is uniquely within a church's ecclesiastical discretion. We find the district court properly concluded that it may not interpret a church's spiritual policies without interfering with the free exercise of religion. But the first amendment does not afford defenses against promises made and contracts formed. A church, like any other employer, is bound to perform its promissory obligations in accord with contract law. Pastor Minker is entitled to rely upon his employer's representations and to enforce them in a secular court. It is possible that the first amendment's prohibition against proceedings that would create excessive entanglements with religious beliefs will make appellant's task at trial more difficult. But these difficulties do not eliminate appellant's right to enforce his employment contract.

Courts must always be wary of efforts to invoke their temporal powers in place of churchly powers. Such efforts are inconsistent with the free exercise of religion that the first amendment asserts to be inviolate. But the line between such proscribed lawsuits and legitimate claims for commercial obligations of a church is a thin one. It is that thin line which we direct the district court to find and hew to in this case. Appellant is entitled to prove up his claim of breach of an oral contract to the extent that he can divine a course clear of the Church's ecclesiastical domain. For such limited purposes, the case is *Remanded.*

GESELL, District Judge, concurring in the result.

I concur in the result and respectfully note my concerns. The opinion deals comprehensively with a difficult case and an even more challenging problem. It seeks without benefit of a factual record to balance our deep-seated respect for First Amendment religious protection against the virus of discrimination based on age,

sex, race and national origin which appears in every aspect of our society. General propositions are stated in a manner that may appear to lay down firm guidance for subsequent religious discrimination cases. In my opinion this is unnecessary. In the future there may well be some who seek to avoid scrutiny of a primary discriminatory objective in the selection or creation of religious officials by exploiting a marginal First Amendment religious claim. I believe the wiser course would be to allow the law to evolve in this difficult area case-by-case, aided, wherever necessary, by meaningful records developed on factual motions or trial. It is too early to anticipate whether some of the absolutes announced in the opinion will withstand the test of time or be considered appropriate under all circumstances.