Henry Willen **SANCHEZ**, Plaintiff,

v.

**CATHOLIC FOREIGN SOCIETY OF AMERICA**, Defendant.

No. 97–1060–CIV–J–10C.

United States District Court, M.D. Florida, Jacksonville Division.

Oct. 21, 1999.

---

Leslie P. Holland, Law Office of Leslie P. Holland, Coral Gables, FL, for Henry Willen Sanchez, plaintiff.

J. Patrick Fitzgerald, Roberto J. Diaz, J. Patrick Fitzgerald, P.A., Coral Gables, FL, for Catholic Foreign Mission Society of America, aka Maryknoll Catholic Foreign Mission Society of America, defendant.

### ORDER

HODGES, District Judge.

This Age Discrimination in Employment Act case comes before the Court for con-sideration of the Defendant's motion for summary judgment (Doc. 41). The Plaintiff has filed a motion (Doc. 48) requesting that his response be accepted as timely filed.[1] Upon due consideration, the Plaintiff's motion (Doc. 48) is GRANTED and the Plaintiff's response shall be deemed timely filed.

### I. Background

The Plaintiff initiated this action by filing a complaint in this Court on August 26, 1997. The facts, as established in the original complaint, are as follows. The Defendant, Catholic Foreign Mission Society of America, also known as Maryknoll Catholic Foreign Mission Society of America (the "Society"), is a non-profit religious organization with offices throughout Florida, including Jacksonville. The Plaintiff, a sixty-eight (68) year old ordained Roman Catholic priest, was formerly employed by the Society from 1963 until 1967.

In 1996, the Plaintiff sought re-employment with the Society as a Catholic priest. The Plaintiff alleges that the Society responded by sending him a letter, advising him that it was the Society's practice to deny reemployment to individuals who had been previously employed with the Society and who subsequently experienced a lengthy separation from its service. Consequently, the Society denied the Plaintiff's request.

The Plaintiff then filed a charge of age discrimination with the Equal Employment Opportunity Commission and received a notice of right to sue letter. On August 26, 1997, the Plaintiff filed the original two-count Complaint, charging the Society with disparate impact age discrimination and intentional discrimination in employment based on age in violation of the Age

---

1. The United States Magistrate Judge previously granted the Plaintiff's motion (Doc. 47) for an enlargement of time in which to respond to the motion for summary judgment. The Plaintiff was then required to file a response by September 10, 1999. The Plaintiff did not file a response within the time required and filed a second motion (Doc. 48) on September 29, 1999 requesting that the Court accept his attached response as timely filed.

Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"). Specifically, the Plaintiff alleged in Count I that former employees of the Society who have experienced protracted periods of separation from the Society's employment are more likely to be over forty years of age and, therefore, the Society's policy has a discriminatory impact on the precise category of individuals protected by the ADEA. The Plaintiff further alleged in Count II that the Society deliberately and willfully refused to rehire him based solely on his age. The Plaintiff sought declaratory relief, reinstatement, back pay, compensatory and/or liquidated damages, punitive damages, and attorney's fees and costs.

The Society responded to the Plaintiff's Complaint by filing a motion to dismiss on May 19, 1998, arguing that any inquiry into its internal policies concerning the hiring of a Roman Catholic priest is impermissible under the First Amendment of the United States Constitution. According to the Society, in order to determine whether it has violated the ADEA, the Court would have to interpret the Society's internal church policies and practices, which would constitute excessive government entanglement with religion, thereby violating the First Amendment. The Court agreed and concluded that any further progress of the litigation would violate the Free Exercise Clause of the First Amendment, stating that "Congress did not intend for the ADEA to apply to clergy positions in a Roman Catholic Church." (Doc. 29). Accordingly, the Court dismissed the Plaintiff's claim with prejudice in its entirety. (Doc. 29).

The Plaintiff then filed a motion for rehearing and argued that in addition to seeking employment with the Defendant as a priest, he had also sought employment as a "brother," which he contends is a lay, non-clerical position. (Doc. 32). During the course of a telephonic hearing held on the Plaintiff's motion for rehearing, the Court set aside the judgment which had been entered on February 18, 1999, and granted the Plaintiff leave to file an amended complaint. (Doc. 39).

In accordance with the Court's order, the Plaintiff filed an amended complaint on July 6, 1999, which is identical to the original complaint in all respects except that the amended complaint includes the following statement: "plaintiff sought reemployment with defendant and requested consideration for, *inter alia,* a lay, nonclerical position as a brother." (Doc. 40). The Defendant responded by filing the motion for summary judgment that is presently before the Court. (Doc. 41).

## II. Standard for Summary Judgment

The entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the non-moving party." *Samples on Behalf of Samples v. Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988). The moving party bears the initial burden of establishing the nonexistence of a triable fact issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove." *Rollins v. TechSouth,* 833 F.2d 1525, 1528 (11th Cir.1987). The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

## III. Discussion

In its motion for summary judgment (Doc. 41), the Defendant argues that fundamental First Amendment law precludes a civil court from deciding whether a religious entity violated the Age Discrimination in Employment Act in employment decisions regarding its ministerial employees. *See* Motion for Summary Judgment at 3 (Doc. 41). At the center of the Defendant's argument is the contention that a brother in the Society performs duties which are "clearly ministerial," such as adhering to an oath of celibacy, obeying religious superiors, and participating in evangelical and outreach efforts of the Roman Catholic Church. *See id.* at 4. In support of its motion, the Defendant offers the affidavit of Bernadette Kenny, an attorney who exclusively represents Roman Catholic religious congregations and their sponsored ministries in all aspects of civil law. *See* Affidavit of Bernadette Kenny (Doc. 46).

According to Kenny, she is thoroughly familiar with the requirements for membership in a religious order or society of apostolic life, including the rights and obligations of individual members under both church law and civil law. *See id.* at 2. As Kenny explains,

> [a] religious brother's qualifications to be a member of a religious society is purely a question of Church law and not a civil law employment issue. In addition to their [sic] being no civil law right to membership in a religious society, regardless of whether it be a clerical or lay society, The Code of Canon Law of the Roman Catholic Church refers to these societies, orders and institutes generally as forms of consecrated life which in itself is neither clerical nor lay.

*See id.* at 3, citing Canon 588 § 1. Kenny further states that a lay institute does not include the exercise of sacred orders and that

> [t]he commentaries to the 1983 Code of Canon Law state that a society which is basically clerical may also include in its membership brothers who have not been ordained to sacred orders.

*See id.* at 3.

Regarding the Defendant's organization, Kenny explains that the primary function of both Maryknoll priests and brothers is participation in religious worship, pastoral work and "spiritual duties." *See id.* Both Maryknoll priests and brothers "are committed by perpetual oath to celibacy and obedience and to preaching the Gospel message in lands and in languages throughout the world." *See id.* at 4. As Kenny describes, Maryknoll brothers help in outreach efforts of the Roman Catholic Church, including the following tasks: evangelizing; spreading the Catholic teachings in twenty seven (27) countries around the world; helping to build "communities of faith"; ministering to the spiritual needs of the sick, elderly, orphans, refugees, and people with AIDS; and "translat[ing] the Gospel of God's love into different languages and cultures." *See id.* at 4.

As Kenny further elaborates, Canon 642 requires religious superiors

> to exercise a vigilant care to admit only those who, besides being of required age, are healthy, have a suitable disposition and have a sufficient maturity to undertake the way of life which is proper

to societies such as the Maryknoll Society. *See id.* Canon 739 obliges members of societies of apostolic life to obey their superiors, the Bishop of the Diocese, and the Pope, maintain celibacy, and to refrain from inappropriate activities. *See id.* Kenny adds that

> Canon 732 applies Canon 602 to Societies of Apostolic Life such as the Maryknoll Society so that the fraternal life

proper to each society unites all the members into one family in Christ and by their fraternal union, rooted and based in charity, the members are to be an example of universal reconciliation in Christ.

*See id.* In conclusion, Kenny states that the canons she cites apply to Maryknoll priests and brothers "regardless of whether the individual is a clerical or lay member and regulate the priests' and the lay brothers' conduct, mission and apostolic service." *See id.* at 6.

Based on the facts presented by Kenny's affidavit, the Defendant argues that the duties of a brother in the Society are "clearly ministerial," and that the Court cannot adjudicate the Plaintiff's claim without violating the First Amendment to the Constitution. *See* Motion for Summary Judgment at 4 (Doc. 41).

In support of its argument, the Defendant begins by citing *Minker v. Baltimore Annual Conference of United Methodist Church,* which held that the maintenance of a minister's claim pursuant to the Age Discrimination in Employment Act would violate the free exercise of religion. *See* 894 F.2d 1354, 1358 (D.C.Cir.1990). Defendant adds that the function of selecting a minister is a matter of church administration and government. *See id.* at 2, citing *McClure v. Salvation Army,* 460 F.2d 553, 559 (5th Cir.1972), *cert. denied,* 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972).[2] The Defendant further argues that the ministerial exception has not been limited to members of the clergy, but also to employees whose duties include "teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship." *See id.* at 2, citing *EEOC v. Catholic University of America,* 83 F.3d 455, 461 (D.C.Cir.1996).

Defendant argues that Kenny's affidavit attests to the fact that a Maryknoll brother is a member of a religious society whose primary functions involve participation in religious worship, pastoral work, and spiritual duties. *See* Motion for Summary Judgment at 3 (Doc. 41). The duties of a brother, which include adhering to an oath of celibacy, obeying religious superiors, and participating in evangelical and outreach efforts, as the Defendant contends, "permeate every aspect of his employment." *See id.* at 4. Therefore, the Defendant asserts that the Plaintiff cannot demonstrate a genuine issue of material fact and asks the Court to enter summary judgment in its favor. *See id.* at 1, 2.

In response, the Plaintiff characterizes the Defendant's motion as raising a single issue of fact—whether a brother in the Catholic Church is a member of the clergy. *See* Response at 1. Plaintiff offers the Code of Canon Law, Chapter II, Canon 266, which states, "[b]y the reception of the diaconate a person becomes a cleric." *See id.* Similarly, the Plaintiff notes that the *Modern Catholic Dictionary,* defines clerics to include those specially ordained such as deacons, priests or bishops. *See id.* Thus, the Plaintiff argues that as a basic matter of construction, brothers are not considered clergy because they are excluded from the list. On the basis that a brother is not a cleric, the Plaintiff therefore argues that the Court can assert its jurisdiction over the Defendant's failure to hire the Plaintiff as a brother. *See id.*

The Defendant, however, has not asserted that Maryknoll brothers are members of the clergy. *See* Motion for Summary Judgment at 4 (Doc. 41). Instead, the crux of the Defendant's argument for summary judgment is that there is no material issue regarding the fact that a Maryknoll brother performs ministerial duties, and

---

**2.** Decisions by the Fifth Circuit prior to September 30, 1981 are binding upon the Eleventh Circuit Court of Appeals and on this Court. *Bonner v. City of Prichard* 661 F.2d 1206, 1207 (11th Cir.1981).

that the Court is precluded from exercising jurisdiction over employment decisions regarding ministerial employees. *See id.* at 3. Consequently, the question of whether or not a brother is a member of the clergy need not be decided by the Court in order for it to address the issues raised on the Defendant's motion.[3]

In response to the Defendant's motion for summary judgment, the Plaintiff has presented no evidence which contradicts the evidence offered by the Defendant regarding the duties of a Maryknoll brother. As established by the Defendant through the statements of Bernadette Kenny, a Maryknoll brother's duties include participation in religious worship, pastoral work and spiritual duties. *See* Kenny Affidavit at 3 (Doc. 46.). As Kenny stated, Maryknoll brothers evangelize, spread Catholic teachings, and minister to spiritual needs in twenty seven (27) countries around the world. *See id.* at 4. As has already been summarized, Kenny also explained the essence of the Maryknoll brotherhood and the devotion of its members to a life of celibacy, obedience, and preaching "the Gospel message in lands and languages throughout the world." *See id.* at 4.

Given this uncontroverted version of the facts regarding the duties of a Maryknoll brother, the Court now turns to the legal inquiry of whether its exercise over the Plaintiff's claim would violate the First Amendment. As was noted in the Court's previous order,[4] for more than a century the Supreme Court has followed a rule of

deference to church authority in "religious or ecclesiastical disputes." *Watson v. Jones,* 13 Wall. 679, 80 U.S. 679, 727–29, 20 L.Ed. 666 (1871). In *Kedroff v. St. Nicholas Cathedral,* 344 U.S. 94, 107, 73 S.Ct. 143, 150, 97 L.Ed. 120 (1952), the Supreme Court recognized the Constitutional concerns raised by interference with administrative control of churches, stating that "legislation that regulates church administration, the operation of churches or the appointment of clergy ... prohibits the free exercise of religion."

■ The Defendant attempts to invoke the "ministerial exception," a principle which has grown out of the Supreme Court's reluctance to interfere with a church's selection of its clergy. *See Gonzalez v. Roman Catholic Archbishop of Manila,* 280 U.S. 1, 16, 50 S.Ct. 5, 7–8, 74 L.Ed. 131 (1929) ("it is the function of the church authorities to determine what the essential qualifications of a chaplain are and whether the candidate possesses them"); *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 717, 96 S.Ct. 2372, 2384, 49 L.Ed.2d 151 (1976) ("questions of church discipline and the composition of the church hierarchy are at the core of ecclesiastical concern"). The ministerial exception precludes civil courts from adjudicating employment discrimination suits between ministers and the church or religious organization employing them. *See EEOC v. Catholic University of America,* 83 F.3d 455, 461 (D.C.Cir. 1996).[5]

---

3. Although, "it is clear to the Court that all matters involving members of the clergy, particularly those involving the employer-employee relationship, are presumptively ecclesiastical and therefore protected by the First Amendment." *See* Order at 9 (Doc. 29).

4. *See* Order at 3 (Doc. 29).

5. *See, e.g., Minker v. Baltimore Annual Conference of the United Methodist Church,* 894 F.2d 1354, 1358 (D.C.Cir.1990) (adjudication of minister's Age Discrimination in Employment

Act claim against his church would violate the Free Exercise Clause); *McClure v. Salvation Army,* 460 F.2d 553, 558, 560 (5th Cir.1972) (recognizing that "[t]he relationship between an organized church and its ministers is its lifeblood" and that application of Title VII to this relationship would encroach on religious freedom); *Young v. Northern Illinois Conference of United Methodist Church,* 21 F.3d 184 (7th Cir.1994), *cert. den.* 513 U.S. 929, 115 S.Ct. 320, 130 L.Ed.2d 281 (1994) (Free Exercise Clause bars Title VII action by probationary minister against her church); *Scharon v.*

The Eleventh Circuit also follows this doctrine of non-interference. The former Fifth Circuit addressed this issue in *McClure v. Salvation Army*, when a female officer in the Salvation Army (the "Army") brought suit against the Army for discrimination on the basis of her gender pursuant to Title VII. *See* 460 F.2d at 560. The court held that, because the relationship at issue was similar to the relationship between a church and its ministers, the plaintiff's action would "result in an encroachment by the State into an area of religious freedom which it is forbidden to enter by the principles of the free exercise clause of the First Amendment." *See id.* The court declined to inject itself into "substantive ecclesiastical matters" such as investigating and reviewing decisions regarding church administration. *See id.* In deciding to affirm the district court's decision to dismiss the complaint, the court noted that such a review "could only produce by its coercive effect the very opposite of that separation of church and State contemplated by the First Amendment." *Id.*[6]

Application of the ministerial exception, however, has not been limited to members of the clergy. *See EEOC v. Catholic University of America*, 83 F.3d 455, 461 (D.C.Cir.1996). The exception has also been extended to lay employees of religious institutions "whose primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order or participation in religious ritual and worship." *See id.* citing *Rayburn v. General Conference of Seventh-day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985) *cert. den.* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986). The *Rayburn* court held that employees whose role is "important to the spiritual and pastoral mission of the church ... should be considered clergy." *See Rayburn*, 772 F.2d at 1169.[7]

In *Rayburn*, the Plaintiff applied for two positions within the General Conference of Seventh-day Adventists (the "Conference"): an associateship in pastoral care and an internship in pastoral care. *See id.*

---

6. *St. Luke's Episcopal Presbyterian Hospitals,* 929 F.2d 360 (8th Cir.1991) (religion clauses bar application of Title VII and Age Discrimination in Employment Act claims of chaplain against church-affiliated hospital); *Natal v. Christian and Missionary Alliance,* 878 F.2d 1575 (1st Cir.1989) (Free Exercise Clause bars wrongful termination action brought by clergyman against not-for-profit religious corporation).

6. The former Fifth Circuit restated this principle again in *Simpson v. Wells Lamont Corp.,* 494 F.2d 490, 493 (5th Cir.1974) (holding that the court was barred from determining "ecclesiastical questions" such as a religious organization's decision to remove its pastor).

7. *See also Scharon* 929 F.2d at 362–63 (finding that a hospital chaplain is "primarily a 'ministerial' position"); *EEOC v. Southwestern Baptist Theological Seminary,* 651 F.2d 277, 283 (5th Cir.1981), *reh'g den.* 659 F.2d 1075 (5th Cir.1981), *cert. den.* 456 U.S. 905, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982) (non-ordained faculty at Baptist seminary qualify

for the ministerial exception where no course has "a strictly secular purpose"); *Powell v. Stafford,* 859 F.Supp. 1343, 1346–47 (D.Colo. 1994) (theology teacher at Catholic high school falls within exception). As this court has already recognized, however, the exception has not necessarily been applied to secular employment decisions at religious schools:

> prohibitions against race, gender, and national origin discrimination contained within Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* have frequently been applied to religious institutions. *See, e.g., EEOC v. Mississippi College,* 626 F.2d 477 (5th Cir.1980), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981) (holding that Title VII properly applies to a church-approved school's secular employment decisions relating to one of its teachers); *EEOC v. Southwestern Baptist Theological Seminary,* 651 F.2d 277 (5th Cir. 1981) *cert. denied,* 456 U.S. 905, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982) (Title VII applicable to administrative and support staff at a seminary).

See Order at 4 (Doc. 29).

at 1165.[8] After she was not awarded either position, the Plaintiff brought a claim against the Conference pursuant to Title VII. *See id.* Undisputed evidence revealed that the associateship in pastoral care entailed teaching baptismal and Bible classes, "pastoring" the singles group, occasional preaching, as well as "other evangelical, liturgical, and counseling responsibilities." *See id.* The District Court held that the Plaintiff's Title VII claim involving the selection of an associate in pastoral care was exempt from Title VII. *See id.*

On appeal, the Fourth Circuit recognized that the duties of an associate in pastoral care included introducing children to the church, leading small congregational groups, and serving as "a liaison between the church as an institution and those whom it would touch with its message." *See id.* at 1168. The court reasoned that

> [a]ny one of these functions so embodies the basic purpose of the religious institution that state scrutiny of the process for filling the position would raise constitutional problems; when all functions are combined the burden of potential interference becomes extraordinary.

*Id.* The court further explained that "[t]he 'ministerial' exception ... does not depend upon ordination but upon the function of the position." *Id.* (citations omitted). Thus, the court affirmed the district court's decision, determining that the Constitution required that it decline review of the Conference's decision not to hire the Plaintiff in an associate pastoral position.

■ As demonstrated by the uncontroverted facts established by the Defendant, Maryknoll brothers perform ministerial duties substantially equivalent to the duties at issue in *Rayburn.* As explained by Bernadette Kerry, Maryknoll brothers

"spread the Catholic teachings," and, in fact, "minister to the spiritual needs" of those afflicted with illness or misfortune. *See* Kerry Affidavit at 4 (Doc. 46). Maryknoll brothers must commit to an oath of celibacy, obedience, and to "preaching the Gospel message in lands and in languages throughout the world." *See id.* at 4. Like the associates in pastoral care addressed in *Rayburn,* a Maryknoll brother preaches, advises, counsels, and serves as a liaison between the church and the public. *See id.* Because the primary functions of a Maryknoll brother involve teaching, ministering, and "spreading the faith," in more than twenty seven (27) countries around the world, it is the opinion of the Court that a Maryknoll brother is the functional equivalent of a minister for the purposes of the ministerial exception. *See EEOC v. Catholic University of America,* 83 F.3d at 461, *Rayburn,* 772 F.2d at 1168–69.

Moreover, the Court remains particularly persuaded by the D.C. Circuit's decision in *Minker v. Baltimore Annual Conference of United Methodist Church,* 894 F.2d 1354, 1355 (D.C.Cir.1990).[9] In *Minker,* the plaintiff was a sixty-three year old Methodist minister who brought an age discrimination claim against his employer, the United Methodist Church. *See id.* at 1355. Although the plaintiff argued that his suit would not require the court to interfere with the church's religious policies or beliefs, the court disagreed. *See id.* at 1356. In holding that the court could not adjudicate the claim without violating the First Amendment, the court stated, "whose voice speaks for the church is per se a religious matter." *See id.* at 1356 (internal quotations omitted).

Certainly the Maryknoll brothers, who "preach[ ] the Gospel message in lands and in language throughout the world," and

---

8. As the Court noted, the position of associate in pastoral care was available to non-ordained individuals. *See id.* at 1165.

9. In the previous decision on the Defendant's motion to dismiss, this Court noted that it was "particularly persuaded" by the D.C. Circuit's opinion in *Minker. See* Order at 8 (Doc. 29).

"translate the Gospel of God's love into different languages and cultures" serve as voices for the Catholic church during their missions. Though the Plaintiff argues that the determinative factor is simply the fact that a Maryknoll brother is not a member of the clergy, the Court disagrees. Instead, the Court finds that because a Maryknoll brother is the functional equivalent of a minister for the purposes of the ministerial exception, the Court is barred by the First Amendment from reviewing the Defendant's decision not to hire the Plaintiff. For the forgoing reasons, the Court declines to adjudicate the Plaintiff's employment discrimination claim and finds that the Defendant's motion for summary judgment is due to be Granted.

### IV. Conclusion

Accordingly, upon due consideration:

(1) The Plaintiff's motion to file a response to the Defendant's motion for summary judgment out of time (Doc. 48) is GRANTED and the Defendant's response shall be deemed timely filed. The Clerk is directed to file the Defendant's response.

(2) The Defendant's motion for summary judgment (Doc. 41) is GRANTED.

(3) The Clerk is directed to enter judgment accordingly, terminate all pending motions, and close the file.

IT IS SO ORDERED.