2006-NMCA-039

131 P.3d 102

Rabbi Isaac **CELNIK** and Peggy Celnik, Plaintiffs–Appellants,

v.

**CONGREGATION B'NAI ISRAEL**, a New Mexico, non-profit corporation, Defendant–Appellee.

No. 24,833.

Court of Appeals of New Mexico.

Feb. 6, 2006.

Corrected April 4, 2006.

Law Offices of Daymon B. Ely, Daymon B. Ely, Albuquerque, NM, for Appellants.

Beall & Biehler, An Association, Marcia E. Lubar, Diane P. Donaghy, Albuquerque, NM, for Appellee.

## OPINION

BUSTAMANTE, Chief Judge.

{1} This case raises an issue of first impression in New Mexico concerning the constitutional prohibition against secular adjudication of certain claims brought against religious organizations by their employees. Known as the "church autonomy doctrine,"

this prohibition arises out of the First Amendment and has been applied in a variety of contexts by other courts, most notably the United States Supreme Court and the federal circuit courts. The question in the present appeal is whether the district court properly applied this doctrine to dismiss a lawsuit brought by a long-tenured rabbi against his congregation after his employment was terminated. We conclude that the facts of this case fall firmly within the prohibition as defined by the federal courts. Accordingly, we affirm.

## BACKGROUND

{2} Plaintiff Rabbi Isaac Celnik (Rabbi Celnik) was originally hired in 1971 by Congregation B'Nai Israel (CBI) of Albuquerque to serve as its rabbi. CBI is the corporate body of Defendant religious congregation. In 1979 Rabbi Celnik entered into an employment contract with CBI for a term of thirty years. According to Plaintiffs' first amended complaint, Rabbi Celnik developed Parkinson's disease in 1996, and his symptoms became more "visually apparent" by the year 2000. In April of 2000, Plaintiff's wife was diagnosed with breast cancer, and some board members of CBI allegedly came to believe that her condition distracted Plaintiff from his rabbinical duties. Plaintiffs' first amended complaint alleged that CBI commenced an "ouster campaign" in late 2000. Plaintiff characterized this campaign as follows:

13. Despite his service at CBI, late in 2000, CBI began a two-pronged effort to oust Rabbi Celnik from CBI by: 1) withholding or failing to pay Plaintiff as required under the terms of his contract; and 2) attempting to compel Rabbi Celnik to release CBI from [Rabbi Celnik's] thirty (30)-year contract ostensibly to become rabbi emeritus through campaign of false promises, harassment, ridicule, and intimidation, including publishing one-sided and negative information about ... Rabbi [Celnik] to Congregation members and other members of the public in an effort to ensure that in the event Plaintiff did not resign, CBI would have the Congregation members' votes to terminate Plaintiff's employment.

14. CBI's motivation for conducting this campaign was in whole or, at least in part, Rabbi Celnik's Parkinson's disease, his age, his wife's medical condition and his complaints about CBI's failure to compensate him in accordance with his contract.

15. This CBI-led movement to oust Rabbi Celnik was carried out from approximately late 2000 through Plaintiff's termination in January of 2002.

16. This negative information included CBI Board members and officers falsely and publicly accusing ... Rabbi Celnik of having a poor work ethic, having no concern for congregation members, and performing poorly as a rabbi by failing to return telephone calls, failing to work adequate hours, failing to make hospital visits, and the like.

{3} Plaintiffs' amended complaint went on to allege that individually named board members organized the ouster campaign, which ended with an ultimatum that Rabbi Celnik either sign an "Agreement and Release of Claims," or be terminated without any health and disability benefits. The agreement stated that Rabbi Celnik was resigning from active service because of a medical condition and would receive unspecified, uncollected monetary pledges. Rabbi Celnik was also required to release CBI from all legal claims. Rabbi Celnik refused to sign the agreement and was terminated, effective January 4, 2002.

{4} Pursuant to the parties' contract, the dispute was submitted to arbitration by the Committee on Congregational Standards under the auspices of the United Synagogue of Conservative Judaism. Rabbi Celnik lost the arbitration, which he claims was limited to the issue of whether the vote to terminate him was properly held. Rabbi Celnik also filed a complaint with the New Mexico Human Rights Commission, which issued an order of non-determination prior to the commencement of the district court action. *See* NMSA 1978, § 28-1-10(D) (2005). Plaintiffs' amended complaint listed Defendants as CBI, one named board member, one named officer, and ten unnamed board members. Plaintiffs included seven counts: (1) violation of the New Mexico Human Rights Act, (2)

breach of the covenant of good faith and fair dealing, (3) prima facie tort, (4) tortious interference with contractual relations against the named board members, (5) interference with prospective business advantage against the named defendants, (6) civil conspiracy against the named board members, and (7) breach of fiduciary duty against the named board members.

{5} CBI filed a motion to dismiss, primarily arguing that the district court lacked subject matter jurisdiction under the First Amendment from adjudicating the claims. CBI also claimed that Plaintiff was collaterally estopped or barred by res judicata from raising the contract issue in Count II because the claim was resolved in arbitration. Plaintiff filed a limited response, reiterating his claims that CBI "presented [to the board] a one-sided view of ... Rabbi [Celnik] as incompetent and uncaring." Pursuant to Rule 1–056(F) NMRA, Plaintiff requested that any hearing on the matter be continued until he could take various depositions. Plaintiffs subsequently filed a response that substantively challenged the First Amendment arguments for dismissal.

{6} The district court denied Plaintiffs' Rule 1–056(F) motion and granted the motion to dismiss. All counts except Count II, relating to contract, were dismissed based on the first amendment. Count II was dismissed based on collateral estoppel. Subsequent to the filing of the briefs on appeal, the parties filed a stipulation that all of the individual defendants would be dismissed, as well as all counts except Count III, relating to prima facie tort. Plaintiffs also are continuing to challenge the denial of their Rule 1–056(F) motion.

**STANDARD OF REVIEW**

{7} The parties dispute the procedural posture of this case and, hence, the standard of review. Plaintiffs contend that the district court considered matters outside of the pleading, thereby converting the motion to dismiss to summary judgment. *See Knippel v. N. Commc'ns, Inc.,* 97 N.M. 401, 402, 640 P.2d 507, 508 (Ct.App.1982) ("Where matters outside the pleadings are considered on a motion to dismiss for failure to state a claim, the motion becomes one for summary judg-

ment."). A summary judgment order is reviewed to see if there are material fact disputes and whether the movant is entitled to judgment as a matter of law. *See Self v. United Parcel Serv., Inc.,* 1998–NMSC–046, ¶ 6, 126 N.M. 396, 970 P.2d 582. CBI contends that the district court did not actually consider matters outside of the pleadings, and therefore its motion was not converted to a motion for summary judgment. *See Clark v. Lovelace Health Sys., Inc.,* 2004–NMCA–119, ¶ 6, 136 N.M. 411, 99 P.3d 232. An order of dismissal based on Rule 1–012(B)(6) for failure to state a claim is reviewed differently than an order granting summary judgment. *See Cypress Gardens, Ltd. v. Platt,* 1998–NMCA–007, ¶ 6, 124 N.M. 472, 952 P.2d 467 ("A motion to dismiss ... is properly granted only when it appears that the plaintiff cannot recover or be entitled to relief under any state of facts provable under the claim.").

{8} A review of the motion hearing transcript indicates that the district court made several references to the fact that the court was considering all of the materials that had been filed. However, there does not seem to be any specific filing that was of particular relevance to the constitutional issue that served as the basis for the dismissal of the complaint. Nevertheless, as discussed below, we believe that dismissal was appropriate regardless of whether we treat the order as one under Rule 1–012(B) or Rule 1–056 (summary judgment).

■ {9} We note that the district court referenced both Rule 1–012(B)(1) (lack of subject matter jurisdiction) and Rule 1–012(B)(6) (failure to state a claim). We believe that a claim of constitutional immunity based on the church autonomy doctrine should be treated in the first instance as a motion under Rule 1–012(B)(6), because the court does in fact have jurisdiction to consider the constitutional claim. *See Bryce v. Episcopal Church in the Diocese of Colorado,* 289 F.3d 648, 654 (10th Cir.2002) (holding that this claim is similar to qualified immunity and should be treated as a motion under Rule 1–012(B)(6) instead of Rule 1–012(B)(1)).

## DISCUSSION

{10} The church autonomy doctrine is based on the First Amendment, which provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. Although the First Amendment expressly refers to Congress, its prohibitions apply equally to the judicial branch. *See Kreshik v. Saint Nicholas Cathedral*, 363 U.S. 190, 191, 80 S.Ct. 1037, 4 L.Ed.2d 1140 (1960). The First Amendment is made applicable to the states by incorporation through the Fourteenth Amendment Due Process Clause. *See Health Servs. Div. v. Temple Baptist Church*, 112 N.M. 262, 263, 814 P.2d 130, 131 (Ct.App.1991).

{11} The doctrine protects both interests: First, it prevents civil legal entanglement between government and religious establishments by prohibiting courts from trying to resolve disputes related to ecclesiastical operations. Second, by limiting the possibility of civil interference in the workings of religious institutions, the free exercise of religion is also protected. *See generally* Marjorie A. Shields, J.D., Annotation, *Construction and Application of Church Autonomy Doctrine*, 123 A.L.R. 5th 385 (2004); Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*, 81 Colum. L.Rev. 1373 (1981).

{12} The United States Supreme Court first announced this rule in *Watson v. Jones*, 80 U.S.(13 Wall.) 679, 20 L.Ed. 666 (1871), a case that involved a property dispute between pro-slavery and anti-slavery church members after the civil war. The Court reversed the state court intervention in the dispute, stating the following:

> [T]he rule of action which should govern the civil courts ... is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.

*Id.* at 727.

{13} Three subsequent Supreme Court cases are of particular relevance here. In *Gonzalez v. Roman Catholic Archbishop*, 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131 (1929), the Supreme Court first applied the doctrine to a dispute involving the right of an ecclesiastical organization to freely choose its leaders. In rejecting a layman's claim that a trust entitled him to appointment to a chaplaincy, the Court reasoned as follows:

> Because the appointment is a canonical act, it is the function of the church authorities to determine what the essential qualifications of a chaplain are and whether the candidate possesses them. In the absence of *fraud, collusion, or arbitrariness,* the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise.

*Id.* at 16, 50 S.Ct. 5 (emphasis added).

{14} In *Kedroff v. Saint Nicholas Cathedral*, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952), the Court considered a New York statute that gave control of New York property of the Russian Orthodox Church to an American group that was attempting to break off from its leadership in Russia. The Court struck down the statute after concluding that it "intrudes for the benefit of one segment of a church the power of the state into the forbidden area of religious freedom contrary to the principles of the First Amendment." *Id.* at 119, 73 S.Ct. 143.

{15} A third case dealing with the right of an ecclesiastical organization to freely choose its leaders and structure is *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976), where the Supreme Court rejected the *Gonzalez* "arbitrariness" reference in a passage that directly addresses the question posed by Plaintiffs' appeal:

> [N]o "arbitrariness" exception—in the sense of an inquiry whether the decisions of the highest ecclesiastical tribunal of a

hierarchical church complied with church laws and regulations—is consistent with the constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law.

*Milivojevich*, 426 U.S. at 713, 96 S.Ct. 2372.

{16} *Gonzalez*, *Kedroff*, and *Milivojevich*, therefore indicate that the dispute in the present case is precisely the type of religious debate that the church autonomy doctrine is intended to protect from judicial review. An examination of the elements and allegations of Plaintiffs' sole pending claim for prima facie tort proves the point. Prima facie tort requires the following: "1. An intentional, lawful act by defendant; 2. An intent to injure the plaintiff; 3. Injury to plaintiff, and 4. [A lack] of justification or insufficient justification for the defendant's acts." *Schmitz v. Smentowski*, 109 N.M. 386, 394, 785 P.2d 726, 734 (1990). Prima facie tort demands a high degree of judicial inquiry because the trial court must engage in a balancing test that weighs "(1) the injury; (2) the culpable character of the conduct; and (3) whether the conduct is unjustifiable under the circumstances." *Beavers v. Johnson Controls World Servs., Inc.*, 120 N.M. 343, 348–49, 901 P.2d 761, 766–67 (Ct.App. 1995) (internal quotation marks and citation omitted).

{17} Here, Plaintiffs' prima facie tort claim alleged that "[d]efendants intentionally disseminated one-sided and negative information about Rabbi Celnik with the intent to sway congregation members against Rabbi Celnik and to compel Rabbi Celnik to lose his employment with CBI." To act as a judicial referee to this particular dispute, applying the intrusive balancing test called for under prima facie tort analysis would require us to ignore the core principles of the church autonomy doctrine.

{18} As indicated by the allegations of Plaintiffs' first amended complaint, set forth above, Rabbi Celnik is claiming that his struggles with Parkinson's disease played a role in his termination. Rabbi Celnik believes that CBI was worried about their lia-

bility for his disability. At the motion's hearing, Plaintiff's counsel argued that "[t]his wasn't about religion . . . this was about money." We are sympathetic to Rabbi Celnik's struggles with Parkinson's and the manifestation of the disease after so many years of service with CBI. We are not persuaded that this circumstance justifies judicial intervention into how CBI treats and selects its ecclesiastical leaders.

{19} We find support in the federal circuit courts, which have addressed the analogous issue of whether the church autonomy doctrine should bend to social policies underlying Title VII civil rights claims. The leading case is from the Fifth Circuit, which first adopted the so-called "ministerial exception" to Title VII claims based on the following first amendment concerns:

[T]he relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern. Just as the initial function of selecting a minister is a matter of church administration and government, so are the functions which accompany such a selection.

*McClure v. Salvation Army*, 460 F.2d 553, 558–59 (5th Cir.1972). Other federal circuit courts subsequently followed suit in barring various claims of discrimination and wrongful termination. *See Werft v. Desert S.W. Annual Conference of United Methodist Church*, 377 F.3d 1099 (9th Cir.2004) (another case involving the dismissal of a claim that the defendant failed to accommodate a disability); *Bryce*, 289 F.3d 648; *Gellington v. Christian Methodist Episcopal Church, Inc.*, 203 F.3d 1299 (11th Cir.2000); *Starkman v. Evans*, 198 F.3d 173 (5th Cir.1999) (another fifth circuit case notable because it affirmed summary judgment for the defendant on failure to accommodate disability claim); *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455 (D.C.Cir.1996); *Young v. N. Ill. Conference of United Methodist Church*, 21 F.3d 184 (7th Cir.1994); *Scharon v. St. Luke's Episcopal Presbyterian Hosps.*, 929 F.2d 360 (8th Cir.1991); *Natal v. Christian & Missionary*

**258**

*Alliance,* 878 F.2d 1575 (1st Cir.1989); and *Rayburn v. Gen. Conference of Seventh–Day Adventists,* 772 F.2d 1164 (4th Cir.1985).

{20} Although the immunity from suit by a religious leader is not absolute, *cf. Elvig v. Calvin Presbyterian Church,* 375 F.3d 951 (9th Cir.2004) (permitting a limited Title VII sexual harassment and retaliation claim to survive motion to dismiss), we believe that the federal authorities discussed above overwhelmingly support dismissal under the facts of the present case.

{21} Finally, to the extent that Plaintiffs believed that additional discovery was necessary, they have not indicated that they would have obtained any specific information that would have changed or explained the basic nature of his claims so as to overcome an overwhelming weight of authority against judicial intervention. *See* Rule 1–056(F) (additional time may be permitted where deemed necessary).

## CONCLUSION

{22} For the reasons discussed above, we affirm the district court.

{23} **IT IS SO ORDERED.**

WE CONCUR: RODERICK T. KENNEDY and MICHAEL E. VIGIL, Judges.