PRESENT:  All the Justices

THE PURE PRESBYTERIAN CHURCH
OF WASHINGTON, ET AL.

v.  Record No. 171098

THE GRACE OF GOD
PRESBYTERIAN CHURCH

OPINION BY
JUSTICE STEPHEN R. McCULLOUGH
August 16, 2018

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Richard E. Gardiner, Judge

Resolving a contest over whether two churches had agreed to merge, a jury found that the

churches had, in fact, contracted to merge.  Based on the jury's finding, the trial court entered an

order enforcing the merger agreement.  The church that lost this contest, The Pure Presbyterian

Church of Washington ("Pure Presbyterian"), seeks to vacate this order, arguing that the trial

court lacked subject matter jurisdiction to enter it.  We conclude that the trial court had subject

matter jurisdiction to adjudicate this dispute and, therefore, we affirm the judgment below.

BACKGROUND

After falling behind on its mortgage payments, a small Korean-speaking Presbyterian

church, Pure Presbyterian, filed for Chapter 11 bankruptcy in November 2015.  Upon learning of

Pure Presbyterian's financial difficulties, another Korean Presbyterian church, The Grace of God

Presbyterian Church ("Grace Presbyterian"), approached an elder of Pure Presbyterian to explore

whether Grace Presbyterian might buy Pure Presbyterian's church property or whether Pure

Presbyterian might be willing to merge.  Pure Presbyterian's building, located at Knight Arch

Road in Fairfax County, Virginia, is a more desirable location than the location of Grace

Presbyterian's church building.  The two churches belonged to separate Korean Presbyterian denominations.[1]

Following additional discussions about the possibility of merging, the congregations put the issue to a vote.  The Pure Presbyterian congregation voted on February 14, 2016 to proceed with the merger.  On February 22, 2016, Grace Presbyterian voted to merge.  On February 24, 2016, leaders from Pure Presbyterian's denomination in Korea, as well as national leaders of that denomination from within the United States, held a meeting with the leadership from Grace Presbyterian to ensure the two churches were compatible from a doctrinal standpoint.  The leadership concluded the merger could take place.

The congregations began joint worship services on March 20, 2016, and on Easter Sunday, March 27, 2016, held a joint worship service at what had been Pure Presbyterian's property.  Witnesses from Grace Presbyterian testified that, at this point, the two churches had merged.  Grace Presbyterian promptly listed and quickly sold its property in Falls Church in order to assume responsibility for the debt on Pure Presbyterian's property.  Following the sale, Grace Presbyterian also took out a loan from a sister congregation to retire Pure Presbyterian's debt.

Leaders from Grace Presbyterian drafted a two-page "Merger Agreement," dated April 4, 2016, to memorialize the merger.  It specified which pastor was to guide the congregation, which elders were to continue serving, and that Grace Presbyterian would pay Pure Presbyterian's outstanding debt.  The pastor from Grace Presbyterian became the pastor for the unified congregation, and the pastor from Pure Presbyterian left on March 6, 2016.  The praise leader

---

[1] Grace Presbyterian belonged to the Presbyterian Church of Korea America, or PCKA, denomination, whereas Pure Presbyterian belonged to The Presbyterian Church in Korea, or PCKP, denomination.

from Pure Presbyterian became the praise leader for the unified congregation. The church chose a new name, initially Washington Presbyterian Church and later Grace of God Presbyterian Church of Washington.

In conformity with the agreement, the congregations formed a "Merger Administrative Council" that met on an as-needed basis to address ongoing issues. For example, the two congregations employed different music styles and had to make some adjustments.

In June 2016, Pure Presbyterian filed a proposed Plan of Reorganization with the bankruptcy court. The plan contemplated two options: Pure Presbyterian could either merge with another church within six months, or sell its Church Property. The bankruptcy court approved the plan in September 2016.

On November 6, 2016, leaders of the unified church received an email stating that Pure Presbyterian wished to withdraw from the "proposed" merger. This announcement came as a surprise to the leaders originally from Grace Presbyterian. At that point, Grace Presbyterian had sold its building and the two congregations had been worshipping together for almost seven months. On December 5, 2016, the pastor and a deacon discovered that they were locked out of the church building. A notice was posted on the door, which stated, in part: "Please do not trespass. Property of Pure Presbyterian Church Members Only! Violators will be prosecuted." In addition, Pure Presbyterian attempted to sell the property to a third party.

In response, Grace Presbyterian, as the Grace of God unified church, instituted this action and obtained a temporary injunction allowing it to worship at the Knight Arch Road building. Count I of its amended complaint asked for a declaratory judgment with respect to whether the churches had agreed to merge and whether Grace of God had complied with the merger agreement. Count II requested an injunction, and Count III, in the alternative, alleged a breach

of contract.  Later, Grace of God asked to nonsuit Count III of the amended complaint as well as the request for compensatory damages.  The court granted the request.

At trial, Pure Presbyterian took the position that there was no merger contract and that, instead, the churches had agreed to a trial period so they could "get to know about the denomination and then the church."  It did not argue that the trial court lacked subject matter jurisdiction to adjudicate the merger question.  The trial court instructed the jury on the law of contracts.  The jury returned a special verdict in favor of Grace Presbyterian, finding that the parties had reached a merger agreement and that Grace Presbyterian had performed its obligations under the merger agreement.  The trial court entered a final order in accord with the merger agreement and the jury's verdict.

## ANALYSIS

I.     GENERAL PRINCIPLES GOVERNING A COURT'S SUBJECT MATTER JURISDICTION.

We have been called upon on numerous occasions to determine when a court possesses or lacks subject matter jurisdiction.  "Jurisdiction . . . is the power to adjudicate a case upon the merits and dispose of it as justice may require."  *Shelton v. Sydnor*, 126 Va. 625, 629, 102 S.E. 83, 85 (1920).  In order for a court to have the authority to adjudicate a particular case upon the merits, to have what we have termed "active jurisdiction," *Farant Inv. Corp. v. Francis*, 138 Va. 417, 427-28, 122 S.E. 141, 144 (1924), several elements are needed.  *See also Morrison v. Bestler*, 239 Va. 166, 169, 387 S.E.2d 753, 755 (1990).  Those elements are:

> subject matter jurisdiction, which is the authority granted through
> constitution or statute to adjudicate a class of cases or
> controversies; territorial jurisdiction, that is, authority over
> persons, things, or occurrences located in a defined geographic
> area; notice jurisdiction, or effective notice to a party or if the
> proceeding is *in rem* seizure of a *res*; and "the other conditions of
> fact must exist which are demanded by the unwritten or statute law

4

> as the prerequisites of the authority of the court to proceed to judgment or decree."

*Id*. (quoting *Farant Inv. Corp.*, 138 Va. at 427-28, 122 S.E. at 144). All of these elements "are necessary to enable a court to proceed to a valid judgment." *Id.* at 169, 387 S.E.2d at 755.

The element of subject matter jurisdiction and the "other 'jurisdictional' elements" differ in several significant respects. *Id.*

> Jurisdiction of the subject matter can only be acquired by virtue of the Constitution or of some statute. Neither the consent of the parties, nor waiver, nor acquiescence can confer it. Nor can the right to object for a want of it be lost by acquiescence, neglect, estoppel or in any other manner. . . . [A]nd the want of such jurisdiction of the trial court will be noticed by this court *ex mero motu* [on its own motion].

*Humphreys v. Commonwealth*, 186 Va. 765, 772-73, 43 S.E.2d 890, 894 (1947) (internal quotation marks and citations omitted); *accord Morrison*, 239 Va. at 169-70, 387 S.E.2d at 755.

The lack of subject matter jurisdiction can be initially raised at any point during the proceedings, including on appeal. *Morrison*, 239 Va. at 170, 387 S.E.2d at 756.[2] "A defect in subject matter jurisdiction cannot be cured by reissuance of process, passage of time, or pleading amendment." *Id.* at 170, 387 S.E.2d at 755. "Without [subject matter] jurisdiction the court cannot proceed at all in any cause." *Ex Parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1869). Once a court determines that it lacks subject matter jurisdiction, "the only function remaining to the court is that of announcing the fact and dismissing the cause." *Id.*

---

[2] "One consequence of the non-waivable nature of the requirement of subject matter jurisdiction is that attempts are sometimes made to mischaracterize other serious procedural errors as defects in subject matter jurisdiction to gain an opportunity for review of matters not otherwise preserved." *Morrison*, 239 Va. at 170, 387 S.E.2d at 756.

Finally, "[w]hile a court always has jurisdiction to determine whether it has subject matter jurisdiction, a judgment on the merits made without subject matter jurisdiction is null and void." *Morrison*, 293 Va. at 170, 387 S.E.2d at 755-56. "A void judgment is in legal effect no judgment. By it no rights are divested and from it no rights are obtained. All claims flowing out of it are void. It may be attacked in any proceeding by any person whose rights are affected." *Harris v. Deal*, 189 Va. 675, 686-87, 54 S.E.2d 161, 166 (1949).

II.    THE TRIAL COURT HAD SUBJECT MATTER JURISDICTION TO ADJUDICATE A DISPUTE OVER THE EXISTENCE OF A CONTRACT TO MERGE TWO CHURCHES.

> Religious freedom is one of the reasons for the existence of the United States. Many of our ancestors overcame great hazards to reach the freedoms offered by our shores. It is only fitting and proper then that courts in America should be cautious, careful, and restrained when called upon to use the secular power of the state to resolve disputes that rage within churches. Without such caution, the brute strength of the state could inadvertently trample upon the delicate balance struck by our founding fathers between issues of church and issues of state.

*Reid v. Gholson*, 229 Va. 179, 193, 327 S.E.2d 107, 116 (1985) (Thomas, J., concurring in part and dissenting in part). With that caution in mind, we proceed to examine the questions before us.

"As a general rule, courts lack subject matter jurisdiction to resolve issues of church governance and disputes over religious doctrine. This prohibition arises from the religion clauses of the Constitution of the United States and the Constitution of Virginia." *Bowie v. Murphy*, 271 Va. 126, 133, 624 S.E.2d 74, 78 (2006); *see also Cha v. Korean Presbyterian Church*, 262 Va. 604, 610-11, 553 S.E.2d 511, 514 (2001) ("[C]ivil courts are not a constitutionally permissible forum for a review of ecclesiastical disputes," and constitutional principles "prohibit the civil courts from resolving ecclesiastical disputes which depend upon inquiry into questions of faith or doctrine."). Under the First Amendment to the Constitution of

6

the United States, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." Similarly, Article 1, Section 16 of the Constitution of Virginia provides that "religion or the duty which we owe to our Creator, and the manner of discharging it, can be directed only by reason and conviction, not by force or violence; and, therefore, all men are equally entitled to the free exercise of religion, according to the dictates of conscience."

Nevertheless, courts are permitted to adjudicate church property disputes, subject to constitutional limitations. "Neither the State Constitution nor the First Amendment deprives church members of their right to resort to the courts for the protection of their property rights, or their civil rights," *Reid*, 229 Va. at 188, 327 S.E.2d at 112. "[W]here church property and civil rights disputes can be decided without reference to questions of faith and doctrine, there is no constitutional prohibition against their resolution by the civil courts." *Id.* at 187, 327 Va. 112. *Compare Bowie*, 271 Va. at 135, 624 S.E.2d at 80 (holding the court had "subject matter jurisdiction over [the plaintiff church deacon's] defamation claims because the claims can be decided without addressing issues of faith and doctrine"), *with Cha*, 262 Va. at 612, 553 S.E.2d at 515 (holding the court lacked subject matter jurisdiction to adjudicate a church pastor's wrongful termination claim, which "would have required that the circuit court adjudicate issues regarding the church's governance, internal organization, and doctrine").

The United States Supreme Court has examined the constitutional limitations courts face in adjudicating church property disputes.[3] Professors Michael McConnell and Luke Goodrich summarize the holdings of these decisions as follows:

---

[3] *See Serbian Eastern Orthodox Diocese for the United States of Am. & Canada v. Milivojevich*, 426 U.S. 696 (1976) (civil courts could not interfere in a church's decision to reorganize itself and remove a bishop); *Kreshik v. Saint Nicholas Cathedral of the Russian*

7

> These decisions constitutionalized two related principles: first, that civil courts should not decide ecclesiastical questions; and second, that churches have a First Amendment right to be free from state interference in their internal affairs. The first may be seen primarily as a principle of the Establishment Clause, barring civil "entanglement" in religious matters, and the second may be seen primarily as a principle of the Free Exercise Clause, protecting the right of believers and religious institutions to order their affairs in accordance with their own convictions. Significantly, the Court recognized that religious freedom is not merely individual but also institutional, and that the First Amendment protects the right of religious communities "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine"—what students of religion would call "ecclesiology" as well as "theology."

Michael W. McConnell & Luke W. Goodrich, *On Resolving Church Property Disputes*, 58 Ariz. L. Rev. 307, 316 (2016).

Pure Presbyterian argues that "whether Grace Presbyterian is the successor church to Pure Presbyterian–the ecclesia–is at its core an ecclesiastical dispute, requiring the courts to choose between competing ecclesiastical interpretations of their congregational votes and joint services, and to determine who the clergy and the membership are." We disagree. Courts must use "neutral principles" in adjudicating church property disputes, such as "well-established concepts of trust and property law." *Jones v. Wolf*, 443 U.S. 595, 603 (1979). "[A]s long as courts avoid religious questions, church property disputes can be resolved just like other property disputes within a voluntary association." McConnell & Goodrich, *supra*, at 319.

---

*Orthodox Church of N. Am.*, 363 U.S. 190 (1960) (extended the rule of *Kedroff* from the legislature to the judiciary); *Kedroff v. Saint Nicholas Cathedral of the Russian Orthodox Church in N. Am.*, 344 U.S. 94 (1952) (New York legislature could not pass a law transferring control over a cathedral from one authority within a church to another); *Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1 (1929) (civil courts could not rule on an individual's qualifications to be appointed a Catholic chaplain).

There is nothing inherently ecclesiastical about an agreement to merge two entities. Although a dispute over the existence or effect of a merger agreement could turn on questions of church doctrine, that is not the case here. Contract law principles are "neutral principles" of law that courts can employ to resolve a dispute between churches. Whether a church voted to merge is a question of fact that does not require a court to resolve an "ecclesiastical" question. Although the merger agreement spelled out who would continue to serve as pastor and which entity would survive, neither of the parties, nor the court, relied on any theological or ecclesiastical principles to resolve the issue of whether the churches agreed to merge and whether Grace Presbyterian honored its commitment under the merger agreement.

Pure Presbyterian cites *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976), and language in *Hosanna-Tabor Evangelical Lutheran Church & School v. E.E.O.C.*, 565 U.S. 171 (2012), to contend that matters of church governance fall outside of the subject matter jurisdiction of Virginia's courts. In *Milivojevich*, the church had removed a bishop because of his defiance of the church hierarchy. 426 U.S. at 706. A state court purported to reinstate him on the basis that the proceedings to remove him did not comply with church laws and regulations. *Id.* at 708. The United States Supreme Court reversed, concluding that hierarchical religious organizations are permitted under the First Amendment to "establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters." *Id.* at 724. Once an ecclesiastical tribunal has decided such a dispute, "the Constitution requires that civil courts accept their decisions as binding upon them." *Id*. at 725. By inquiring into whether the church had followed its own procedures, the state supreme court had "unconstitutionally undertaken the resolution of quintessentially religious controversies whose resolution the First Amendment commits exclusively to the

9

highest ecclesiastical tribunals" of the church. *Id.* at 720. There is a significant difference between *Milivojevich* and this case. In *Milivojevich*, a court was second-guessing whether a church followed its own internal ecclesiastical procedures in selecting its leadership. In this case, the court inquired into whether there was an agreement to merge and, if so, whether it was honored. The validity of, or conformity to, ecclesiastical procedures was not at issue. Under *Milivojevich*, a court *can* adjudicate a church property or contractual dispute if it can do so "without resolving underlying controversies over religious doctrine." *Id.* at 710 (citation omitted). That is what occurred here.

Resolution of a dispute using neutral principles of law may have an *effect* on church governance. For example, the bankruptcy process, like a merger, may put a particular church out of existence altogether. But it will not be suggested that bankruptcy courts lack the subject matter jurisdiction to adjudicate such cases. The same holds true for a merger.

A holding that courts categorically lack subject matter jurisdiction to adjudicate disputes that have an effect on church governance, even based on strict neutral principles, would place churches in a singularly disfavored position compared to all other litigants. Churches can decide to merge for a wide range of reasons, such as cost savings, increasing the size of the congregation, or offering more programs. A court has subject matter jurisdiction to referee any disputes that arise under these agreements, so long as it employs strictly neutral principles in resolving the dispute. In this instance, theological questions played no role in the jury's resolution of whether there was a merger agreement and whether it was breached. Consequently, the court had subject matter jurisdiction to adjudicate this dispute.

10

III.     THE COURT HAD SUBJECT MATTER JURISDICTION TO ENTERTAIN A SUIT FOR DECLARATORY JUDGMENT.

"At Common Law there could be no action in the absence of actual injury—someone must have been hurt." Henry R. Gibson, Gibson's Suits in Chancery § 44.09 (8th ed. 2018). Declaratory judgment acts were enacted in response to this problem. In the words of one commentator, declaratory judgment statutes were enacted to allow courts to "operate as preventive clinics as well as hospitals for the injured." *Id.* Code § 8.01-184 "is the statutory authority for declaratory judgment proceedings in this Commonwealth. From it stem[s] the jurisdiction of the courts of record to entertain applications for declaratory relief and the power to make binding adjudications of the rights of the parties involved." *City of Fairfax v. Shanklin*, 205 Va. 227, 229, 135 S.E.2d 773, 775 (1964).

Declaratory judgment statutes

> permit the declaration of [a party's] rights before they mature. In other words, the intent of the act is to have courts render declaratory judgments which may guide parties in their future conduct in relation to each other, thereby relieving them from the risk of taking undirected action incident to their rights, which action, without direction, would jeopardize their interests.

*Liberty Mut. Ins. Co. v. Bishop*, 211 Va. 414, 421, 177 S.E.2d 519, 524 (1970).

When the "actual objective in the declaratory judgment proceeding [i]s a determination of [a] disputed issue rather than an adjudication of the parties' rights," the case is not one for declaratory judgment. *Green v. Goodman-Gable-Gould Co.*, 268 Va. 102, 108, 597 S.E.2d 77, 81 (2004). Therefore, "where claims and rights asserted have fully matured, and the alleged wrongs have already been suffered, a declaratory judgment proceeding, which is intended to permit the declaration of rights before they mature, is not an available remedy." *Board of Cty. Supervisors v. Hylton Enters.*, 216 Va. 582, 585, 221 S.E.2d 534, 537 (1976). In addition, the

11

purpose of a declaratory judgment action is not to resolve disputed facts. *Green*, 268 Va. at 107, 597 S.E.2d at 80 ("Where a declaratory judgment as to a disputed fact would be determinative of issues, rather than a construction of definite stated rights, status, and other relations, commonly expressed in written instruments, the case is not one for declaratory judgment." (citation omitted)).

Pure Presbyterian argues that the dispute below was not appropriate for declaratory relief, both because the dispute had "fully matured," *i.e.* the alleged wrong had already been suffered, and because the dispute turned on contested factual questions. Therefore, according to Pure Presbyterian, the trial court entered a judgment without subject matter jurisdiction. Pure Presbyterian did not raise this issue in the trial court. Our rules of procedural default require a litigant to raise an issue in the trial court in order to preserve the issue for appellate review. Rule 5:25. A subject matter jurisdictional defect, however, can be raised for the first time on appeal. *Morrison*, 239 Va. at 170, 387 S.E.2d at 756.

"Jurisdiction of the subject matter can only be acquired by virtue of the Constitution or of some statute." *Shelton*, 126 Va. at 629, 102 S.E. at 85. To state the obvious, circuit courts have subject matter jurisdiction over contract disputes, which would include merger agreements. *See* Code § 17.1-513. The General Assembly also has conferred authority on circuit courts to issue declaratory judgments. *See* Code § 8.01-184.

Just as courts have authority to issue declaratory judgments, courts also have authority to grant other forms of relief, including injunctions, specific performance, and monetary damages. Although a court may commit an error of law in granting a specific form of relief, including a declaratory judgment, that does not mean that the court lacked *subject matter jurisdiction* to award the relief. "The validity of a judgment based upon a challenge to the application of a

statute raises a question of trial error, and not a question of jurisdiction. If the inferior court has jurisdiction of the subject matter of the controversy, and the parties are before it, . . . a mistaken exercise of that jurisdiction does not render its judgment void." *Parrish v. Jessee*, 250 Va. 514, 521, 464 S.E.2d 141, 145-46 (1995) (alteration in original) (internal quotation marks and citations omitted). Should a trial court err in entertaining an action for declaratory judgment, the proper remedy is to raise the point in the trial court and, if necessary, seek relief on appeal. *See id.* at 521, 464 S.E.2d at 146 ("[T]he court has jurisdiction to err, as well as to correctly adjudicate the questions before it for decision, and the remedy to correct the errors of the court is solely by appeal.") (citations omitted).

In reaching this conclusion, we also make note of the General Assembly's declaration of the purpose behind the declaratory judgment statute:

> This article is declared to be remedial. Its purpose is to afford relief from the uncertainty and insecurity attendant upon controversies over legal rights, without requiring one of the parties interested so to invade the rights asserted by the other as to entitle him to maintain an ordinary action therefor. It is to be liberally interpreted and administered with a view to making the courts more serviceable to the people.

Code § 8.01-191. Adopting the appellant's argument would have the opposite effect. It would expose every final declaratory judgment to the possibility of creative challenges sometimes years after the judgment had become final, based on claims of defects in subject matter jurisdiction. Such an unsettling outcome is warranted neither by the declaratory judgment statute nor by our precedent.

*Charlottesville Area Fitness Club Operators Ass'n v. Albemarle County Board of Supervisors*, 285 Va. 87, 737 S.E.2d 1 (2013), cited by the appellants, has no bearing on this case. There, we simply concluded that there was no justiciable controversy and, therefore, we

13

vacated the circuit courts' judgments and dismissed the actions. *Id.* at 93, 737 S.E.2d at 4. Here, there plainly is a justiciable controversy over the existence of a merger agreement.

The trial court had subject matter jurisdiction either to adjudicate a breach of contract claim or to issue a declaratory judgment on the merger contract. Assuming (without deciding) that the trial court erred by issuing a declaratory judgment, the court nonetheless had subject matter jurisdiction.

IV.     THE PENDING BANKRUPTCY DID NOT FORECLOSE THE TRIAL COURT'S
        ADJUDICATION OF THE MERGER CONTRACT.

Pure Presbyterian finally contends that the trial court lacked subject matter jurisdiction to dispose of the church property, because at the time of filing, the bankruptcy court implicitly retained in rem jurisdiction over the property for all purposes, other than for effecting a merger or sale, and it also retained jurisdiction over the indebtedness. Accordingly, it argues, the court's final order in which it disposed of the Church Property is thus void *ab initio*.

"A bankruptcy court retains post-confirmation jurisdiction in a chapter 11 proceeding only to the extent provided in the plan of reorganization. The bankruptcy court's post-confirmation jurisdiction therefore is defined by reference to the Plan." *Hospital & Univ. Property Damage Claimants v. Johns-Manville Corp.*, 7 F.3d 32, 34 (2d Cir. 1993) (citations omitted). On September 21, 2016, the bankruptcy court approved the plan of reorganization submitted by Pure Presbyterian. Article IX of the plan "retain[ed] jurisdiction of th[is] case" for an enumerated list of purposes. Article IX did not encompass the church property and said nothing about the merger agreement. Nothing, therefore, foreclosed the Fairfax County Circuit Court from exercising post-confirmation jurisdiction to determine whether a merger had, in fact, occurred. Therefore, the trial court had jurisdiction to adjudicate the complaint.

14

CONCLUSION

We will affirm the judgment of the trial court.

*Affirmed.*